Filing # 42557109 E-Filed 06/09/2016 04:38:24 PM

**IN THE CIRCUIT COURT OF THE NINTH JUDICIAL CIRCUIT, IN AND FOR ORANGE COUNTY, FLORIDA**

REMBERT THOMAS BROWN,

Plaintiff,

vs.

**CASE NO.** ____________________

DIAMOND RESORTS INTERNATIONAL MARKETING, INC.,

Defendant.
______________________________________/

**JURY TRIAL DEMANDED**

## COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff, Rembert Thomas Brown ("Brown"), brings this complaint against Diamond Resorts International Marketing, Inc. (hereafter "Diamond"), for violations of the Florida Private Sector Whistleblower Act, Florida Statute § 448.101, et seq. ("FWA"), and in support thereof states as follows:

## NATURE OF ACTION

1. This is an action arising from and seeking redress for violations of the FWA.

2. Diamond's practices as alleged herein violated the FWA.

## JURISDICTION AND VENUE

3. This Court possesses jurisdiction over the cause of action asserted by Brown as it seeks damages in excess of $15,000.00 arising from the acts of Diamond as set forth herein.

4. Moreover, venue is proper in this Court because Brown's causes of action accrued in Orange County, Florida.

5. Diamond is a registered foreign corporation that maintains offices located at 7357 and 7345 Greenbriar Parkway, Orlando, Orange County, Florida 32819.

6. Diamond employed Brown within Orange County.

7. Diamond conducts business in Orange County.

8. During the time period material hereto, Brown was an "employee" of Diamond as that term is defined under the FWA.

## PARTIES

9. Brown is a resident of Orlando, Orange County, Florida, and was employed as a sales manager for Diamond in its Orlando office.

10. Diamond, a Nevada corporation with offices in Orange County, Florida, is engaged in the business of, among others, selling timeshare interests in its resorts and properties located throughout the United States, including Florida.

## GENERAL FACTUAL ALLEGATIONS

11. Brown, who has over ten (10) years of experience in the timeshare sales industry, was a sales manager for Diamond for seven months until his abrupt termination on July 11, 2014.

## OBJECTIONS TO VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT OF 2008 AS AMENDED (ADAAA), THE FLORIDA CIVIL RIGHTS ACT OF 1992 CHAPTER 760, FLORIDA STATUTES (FCRA) AND THE HEALTH INSURANCE PORTABILITY AND ACCOUNTABILITY ACT OF 1996 (HIPAA)

12. Brown is a lifelong type 1 diabetic who is dependent upon insulin injections to manage his diabetes and to vitally function.

13. Without insulin treatment, Brown would experience multiple life threatening complications from hyperglycemia, including weight loss, kidney failure, nerve damage, and eye damage.

14. Brown's confidential medical condition was openly discussed during management and sales meetings while he was employed by Diamond, for which he complained.

15. During his employment, Brown brought injectable insulin and diabetic supplies with him to use as required during the day to control his diabetes.

16. Having no secure place to store his insulin, Brown had no viable option other than to leave his life sustaining supplies on his desk.

17. Unbelievably, Brown's insulin and supplies were stolen from his desk on several occasions during his employment.

18. These thefts were reported by Brown to Diamond's management as well as in monthly building meetings.

19. After the second theft, Brown requested an opportunity to review building security footage in an effort to determine who stole his insulin. His request was summarily denied.

20. Brown sent Rachel Donaldson ("Donaldson"), Human Resources Manager, an email on April 28, 2014, at 11:56 a.m., stating, "Hostile and offensive action . . . have placed me under undue duress which has greatly affected my medical condition. If possible, *can we meet to discuss these matters as well as make accommodations for my type one diabetic needs*[?]" (Emphasis added). The Senior Vice President of Sales, was copied on this communication.

21. The requested meeting occurred later that evening with his supervisors, Vern Toland ("Toland"), Vice President of Sales, and Sean Hovenden ("Hovenden"), Director of Sales, along with Donaldson.

22. During the meeting Brown discussed specific reasonable accommodations that would enable him to perform the necessary functions of his job.

23. Brown requested a place to store and lock his diabetic supplies as a result of the prior thefts he experienced, including his injectable insulin doses, a private and clean area for

him to check his blood glucose levels and administer his medication, the clearance to keep food and beverages at his desk, and protection of his confidential medical condition.

24. At the conclusion of the meeting, Donaldson told Brown she would have a lock placed on his desk drawer that week.

25. However, she advised him that eating and drinking at his work station was against company policy and, thus, that part of the request was denied.

26. On Wednesday, May 7, 2014, after being away from his desk for a short period of time, Brown returned to it so that he could check his blood sugar level.

27. Upon his return, he was shocked to discover someone had again stolen his insulin.

28. When Brown finally gained access to insulin later that night at home, his blood glucose levels had elevated to a dangerously high 826 and a diabetic episode ensued.

29. On Monday, May 12, 2014, after not receiving any follow up to his accommodation requests, including his request for a lock on his desk drawer, Brown objected to Donaldson and submitted a written complaint to her and emailed a copy to the Senior Vice President of Sales stating,

> As I communicated to you on April 28, these and other conditions have greatly affected my medical condition. And again, I am respectfully requesting accommodations that will prevent undesirable actions as well as enable me to regulate my health in a safe and responsible work environment. This request includes being provided with a protective option to store and lock personal Diabetic supplies and insulin at my work station. A private, safe and clean area to check my blood glucose levels and administer medication as well as to rest until sugar levels normalize. The ability to keep food and drink at my desk and be afforded fair protection of my confidential medical condition and records.

30. Donaldson accepted the memorandum from Brown and scheduled a meeting with him to occur on May 21, 2014.

31. At the May 21, 2014, meeting, Donaldson told Brown he must submit proof of his medical condition.

32. On Wednesday, May 28, 2014, a lock was finally placed on Brown's desk drawer.

33. Incredibly, however, the key that was left for Brown did not fit the lock and, as a result, he did not have access to his insulin.

34. Despite Brown's repeated requests for access throughout the day to the building manager and Donaldson, and later in the day to Toland and Hovenden, he was unable to access the life sustaining insulin in the locked drawer.

35. By 5:30 p.m. on May 28, Brown's blood sugar level had significantly elevated and he grew dangerously weak.

36. By 8:00 p.m., reaching a critical stage, Brown told Hovenden he had an emergency and he must go home early to inject himself with insulin, to which Hovenden's callously responded, "Man up. I need you on the sales floor," despite the obvious life threatening risks associated with denying Brown leave to obtain the insulin his body desperately needed to function.

37. Brown informed Donaldson of the desk key issue on May 28 and again on June 4, 2014. Brown confirmed his June 4 communication with Donaldson in a June 6, 2014, 2:01 p.m., email. ("Hello Rachael, as we discussed on Wednesday [June 4], last week [May 26-30] Conrad locked my drawer and left the wrong key.").

38. On Tuesday, June 3, 2014, Brown's endocrinologist's office submitted proof of Brown's serious medical condition to Diamond.

39. Erin Blackburn, ARNP ("Blackburn") explained Brown's lifelong type 1 Diabetes Mellitus condition and that Brown's use of insulin was necessary for him to function.

40. In addition, Blackburn, on behalf of Brown, requested the following to prevent Brown from experiencing hyperglycemia and hypoglycemia events: (1) frequent breaks to check blood sugar, eat, administer insulin, and treat high or low blood sugar; (2) permission to have food and beverages available at Mr. Brown's workstation; (3) permission to eat and drink at his work station as needed; (4) access to a clean, private area to check Mr. Brown's blood sugar and administer insulin; and (5) excuse from work for occasional late arrivals because hypoglycemia can cause symptoms that make it unsafe to drive.

41. Blackburn concluded, "With these accommodations, Brown can safely and fully perform all essential job duties."

42. On Tuesday, June 10, 2014, Brown received an e-mail from Donaldson at 11:58 a.m., which explained the desk key issue had finally been resolved ("We have the key issue resolved as of yesterday."). Thus, Brown's locked drawer was not opened until June 9, 2014.

43. Donaldson also informed Brown that his request to eat and drink at his desk was now approved.

44. Although Donaldson suggested some possible locations for private rooms, Brown was told later in the day by Donaldson that Toland and Hovenden had "other plans" for the rooms.

45. Thus, the most critical of Brown's requested accommodations, access to a private room to check his blood sugar level and administer insulin, was denied; Brown objected to the denial of this request for an accommodation to Donaldson.

46. Three days later, on Friday, June 13, 2014, Brown was suspended with no meaningful attempt at granting him the several reasonable and necessary accommodations that would allow Brown to perform his essential job duties.

47. Brown's employment was ultimately terminated shortly thereafter on July 11, 2014.

## OBJECTIONS TO UNLICENSED SALES ACTIVITIES PURSUANT TO FLORIDA STATUTE § 475.42

48. Additionally, during the first week of June 2014, Toland invited several out-of-state sales agents and sales manager, Binni Thomas ("Thomas"), to Diamond's Orlando telesales call center.

49. Brown recognized some of these agents from a prior meeting, including sales agent Brandon Prescott ("Prescott").

50. On Wednesday, June 4, 2014, Prescott told Brown that he finally received a commission on an upgrade sale he made while in Orlando during his prior trip.

51. Brown recalled the sale because Prescott, after completing the sales process and negotiating the financial terms of the sale, asked Brown to obtain the buyer's credit authorization and speak with the buyer about a special incentive deal that Diamond was offering at the time.

52. After Prescott told Brown about receiving commission from the sale, Brown asked him whether he had received his Florida real estate license.

53. In response, Prescott told Brown he only had a Washington state solicitation certificate.

54. Concerned, Brown alerted Hoveden to Prescott's non-licensed sales activity.

55. Florida Statutes provide, "A person may not operate as a broker or sales associate without being the holder of a valid and current active license therefor." § 475.42(1)(a), Fla. Stat. (2014).

56. Hoveden brushed aside this information and told Brown all the out-of-state agents were authorized by Diamond H.R. to make sales over the phone.

57. Later in the evening of June 4, 2014, Brown, along with a majority of the sales team, observed all the out-of-state agents, including their supervisor, Thomas, making sales calls out of the Orlando call center.

58. Brown immediately reported this issue to Toland and asked him to explain how out-of-state agents were allowed to sell in Florida without a valid Florida real estate license, a statutory requirement for in-state agents.

59. Toland bluntly threatened Brown in response, "You're this close to being fired. I'm tired of your shit," and explained, "If you don't approve, you can leave."

60. On June 5, 2014, the day after Brown's meeting with Toland, Brown e-mailed Donaldson and Senior Vice President Michael Flasky to notify them of the unlicensed activities of the out-of-state sales agents and their manager and again communicated his objection to those activities.

> Good afternoon, Vern Tolland (*sic*) has invited several agents from Diamond Resorts International's Seattle Call Center to Our Orlando branch. One of the agents, Brandon Prescott, shared with me that on his last visit to our Orlando office he actively sold and received commission from a sale originated here. Under Florida state statute, It is a third degree felony for any person to sell or attempt to sell real estate without possessing a valid Florida Real Estate License. Does he and the other Seattle agents presently making sales calls at our Orlando call center have the necessary license required by all of our other Florida sales professionals at DRI? Are we in compliance with the law? If not, as a manager of this great company and responsible for protecting its interest, I do not condone these criminal violations by Our Telesales Leadership. Please advise.

61. In a separate e-mail to Donaldson that same day, Brown explained, "By the way, the same agent sold another Orlando contact yesterday. I believe he is not aware of our state law. But I do highly recommend the immediate attention in this matter today. The penalty for our corporation could be severe . . . ."

62. In response, Donaldson told Brown later that evening, "Your information has been shared with the proper people, and is actively being researched."

63. Five days after Brown e-mailed Donaldson this information, presumably realizing the illegal nature of the issues identified by Brown, Diamond issued a standard operating procedure ("SOP") on June 10, 2014 which prohibited selling activities by any national telesales team member "until proper licensure has been verified and specific approval . . . has been obtained."

64. Donaldson e-mailed Brown that day and explained, "Since there was confusion about traveling/visiting sales agents, managers, trainer[s] getting on the phone and the licensing component, we put together a SOP for everyone to sign to ensure the rules and processes are clearly defined going forward."

65. There should have been no confusion by Diamond; Florida Statute § 475.42 is straightforward and unambiguous.

66. Not surprisingly, as a result of the newly issued SOP, Diamond's President, David F. Palmer, told Toland, "You have my attention."

67. Brown was suspended approximately one week after his June 4 meeting with Toland and his June 5 e-mail objecting to the unlicensed activity of the out-of-state employees.

68. On June 13, 2014, obviously frustrated and agitated with Brown's objections to unlicensed sales activity and his requests for accommodations, Toland was overheard telling Hovenden and Donaldson, "I don't care if it costs us $100,000. We'll make it up. I can't work with this guy [Brown] and I want him out of here."

69. Brown was suspended that day, although he had no prior disciplinary history, including no verbal or written warnings or reprimands.

70. On July 11, 2014, Diamond terminated Brown's employment.

71. Brown's termination was due his objected to and refused to participate in Diamond's several violations of laws, rules, and regulations, including violations of Florida Statute § 475.42, the ADAAA, FCRA and HIPAA.

## COUNT I: FLORIDA PRIVATE SECTOR WHISTLEBLOWER ACT

72. Brown incorporates by reference paragraphs 1 through 71 of this Complaint.

73. During the time period material hereto, Brown was an "employee" of Diamond, as that term is defined under the FWA.

74. Brown engaged in protected conduct by expressing his opposition to Diamond's acts violating the ADAAA, FCRA, HIPAA and for violating Florida Statute § 475.42.

75. As a direct and proximate result of his protected activity, Brown was subjected to retaliatory personnel action by Diamond, including termination.

76. As a direct and proximate result of Diamond's actions, Brown has suffered a loss of employment and related economic and emotional injuries.

WHEREFORE, Brown demands judgment against Diamond for:

a. Compensation for lost wages, benefits, and other remuneration;

b. Front pay;

c. Compensatory damages;

d. Injunctive relief; and

e. Attorney's fees and costs.

## DEMAND FOR JURY TRIAL

Brown hereby demands a trial by jury on all issues and counts triable of right before a jury.

Date: June 9, 2016.

Respectfully submitted,

s/ Christopher A. Pace
Jill S. Schwartz, Esquire
Florida Bar No. 523021
Christopher A. Pace, Esquire
Florida Bar No. 676721
JILL S. SCHWARTZ & ASSOCIATES, P.A.
655 W. Morse Blvd., Suite 212
Winter Park, Florida 32789
Telephone: (407) 647-8911
Facsimile: (407) 628-4994
E-mail: jschwartz@schwartzlawfirm.net
E-mail: cpace@schwartzlawfirm.net

Attorneys for Plaintiff